George Wise, Appellant, v. The Brooklyn Heights Railroad Company, Respondent.

*Negligence — passenger alighting from an electric railroad car and passing behind it struck by a car approaching on the other track — circumstances presenting a question for the jury — duty of the railroad company.*

A passenger upon an electric railroad car, who alights therefrom in a thinly-populated suburban district, not at a street intersection, at ten o'clock at night, and upon passing around the rear end of the car which he has left, and reaching the first rail of the adjoining track, is struck by the fender of another car running thereon at a high rate of speed, is, in view of the darkness and the uncertainty as to the distance at which an approaching car could have been observed, entitled to have the question of the negligence of the railroad company submitted to the jury.

*Semble,* that the question whether the passenger should have seen that the second car was in close proximity, and likely to render the crossing dangerous, is, also, under all the circumstances, for the jury.   Per Hatch and Woodward, JJ.

*Semble,* that in such a locality, where a car has come to a standstill, or is moving so slowly as to permit passengers to alight, and they do alight, the railroad company is chargeable with notice that a passenger thus alighting is as likely to pass to one side of the street as to the other, and, under such circumstances, the company is held to a rigid degree of care in making the place safe for that purpose, and is not justified in running its cars at a high rate of speed past the standing car.   Per Hatch and Woodward, JJ.

*Semble,* that a passenger has a right to assume that, during the time necessary for him to alight from a car and reach a place of safety upon either side of the street, the company will not make the surrounding conditions dangerous to him.   Per Hatch and Woodward, JJ.

Goodrich, P. J., dissented.

Appeal by the plaintiff, George Wise, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Kings on the 19th day of January, 1899, upon the dismissal of the complaint at the close of the plaintiff's case by direction of the court after a trial at the Kings County Trial Term.

*S. S. Whitehouse,* for the appellant.

*John L. Wells,* for the respondent.

Hatch, J.:

The testimony disclosed that the plaintiff was a passenger upon the defendant's car for the purpose of transportation from the point where he entered the car to a trolley station on Bay Ridge avenue,

between Tenth and Eleventh avenues, in the borough of Brooklyn. This point is in the suburban section of the borough of Brooklyn, and is comparatively thinly populated. It is in a long block, and the trolley station is not at the point of intersection of any street, but was established for the accommodation of passengers living in that locality. The plaintiff arrived at the point of destination at about ten o'clock at night. The car upon which he was riding did not entirely stop, but ran very slowly, sufficiently so for the plaintiff to alight without injury. The plaintiff lived between Tenth and Eleventh avenues, and to reach his habitation he was required to cross the adjoining track upon which the cars ran in an opposite direction. He passed by the rear end of the car upon which he had been riding, and which still continued in motion, reached the first rail of the second track, was struck by the fender of a car running thereon at a high rate of speed, and received the injuries of which complaint has been made.

The proof was sufficient to establish negligence upon the part of the defendant in the operation of the car which struck the plaintiff; but the court was of opinion, within the rule laid down by this court in *Landrigan* v. *Brooklyn Heights R. R. Co.* (23 App. Div. 43), that the plaintiff was guilty of contributory negligence in failing to observe the approach of the car, and for this reason it dismissed the complaint.

While the case in some of its features is quite similar to the case which controlled the action of the court, yet, in some of its aspects, it is clearly distinguishable therefrom. In the case relied upon, the accident happened in broad daylight, and it was evident that the plaintiff, in the exercise of ordinary care, ought to have discovered and avoided the approaching car. In the present case the accident happened at night, and the distance from which the car might have been observed was not entirely clear, it being insisted by the plaintiff that the obstruction of the car from which he had alighted, and the surrounding darkness after he had passed it, rendered the proximity of the approaching car quite uncertain. It appeared from the testimony of the motorman upon the car from which the plaintiff had alighted, that when the plaintiff alighted the approaching car was then distant from 800 to 1,200 feet, at a time when it was visible to him. The approaching car ran upon a descending grade,

and, if the plaintiff saw it at the time when he alighted, he might well have assumed that he would be able to cross the adjoining track before it reached such point; and the question whether ordinary prudence required him to again look before crossing the track would have been clearly a question for the jury. The plaintiff, however, testified that as he passed the first car he looked in the direction of the approaching car, but did not discover its proximity to him at that time. Whether he should have then seen that the car was in close proximity and likely to render the crossing dangerous is a matter which we think presented a question for the jury under all the circumstances surrounding the situation. It is easy of deduction, we think, that a person in the light of day, with nothing to obstruct his vision, ought to discover the approach of a car if he used his eyesight; and yet, at the same place, by reason of darkness and the existing obscurities, he might not, in the exercise of prudence, determine that the car was so close as to render it dangerous to attempt the crossing of the track, and under such circumstances the question ought not to be answered by the court.

But there is another view of the case which tends strongly to excuse the plaintiff's act. While it is true that in the thickly-settled parts of the city the practical operation of cars does not admit of the actual stoppage of an approaching car at a street crossing where a car running in the opposite direction is at a standstill, for the purpose of permitting passengers to alight, as such stoppage might continually embarrass the traffic of the street, yet such rule does not apply in suburban localities, where the burden of use of the street is practically limited to the passage of cars thereon and a few vehicles. Under such circumstances the railroad company, in the operation of its cars, has the practical control of the situation, and may, by the exercise of a little care, make the place where passengers are expected to alight perfectly safe, so far as its operation is concerned, with little or no hindrance to any other persons or vehicles making use of the street. When a car has come to a standstill, or is moving so slowly as to permit persons to alight, and passengers do alight at such place, the railroad company is chargeable with notice that the passenger thus alighting is as likely to pass to one side of the street as to the other, and under such circumstances the company ought to be and is justly held to a rigid degree of care in making

the place safe for the passenger to reach either side of the street. Under such circumstances there is scarcely justification for the company to run its cars at a high rate of speed past the standing car which it knows is in that position for the purpose of permitting passengers to alight, and, as the whole situation is the creation of the defendant, it ought not to be excused for inflicting injury upon a passenger which it has carried to that point, unless such passenger be the willful or heedless instrument of his own injury. Under such conditions we think it does not establish any harsh rule or mitigate in any sense the doctrine of ordinary care for the passenger to assume that, during the time necessary for him to alight and reach a place of safety upon either side of the street, the defendant will not make the surrounding conditions dangerous to him. We think, therefore, that the conduct of the plaintiff under the circumstances of this case is to be governed by the surrounding conditions, measured by the obligation which the defendant owed him not to make the place dangerous, and that it so far excuses his failure to observe the approaching car as to require the submission of his negligence to the scrutiny of a jury. (*McGreevy* v. *Buffalo Railway Co.*, 145 N. Y. 621. See record, Court of Appeals Cases, volume 1260, in the Brooklyn Law Library.) The case of *Thompson* v. *Buffalo Ry. Co.* (145 N. Y. 196) is not in contradiction of this view. The attempt to cross the street in that case was at a point where there were no intersecting streets, and no station at which passengers were expected to alight, and the car was run through a thickly-settled locality. Besides, the plaintiff in that case was the heedless instrument of her own injury.

While we might be willing to say that the doctrine announced in the *Landrigan* case would be conclusive had this accident happened in the light of day and in a thickly-settled locality, we are not willing to say that such rule should be applied to the locality and the conditions which surrounded this accident.

We conclude, therefore, that the case should have been submitted to the jury, and for this reason the judgment should be reversed and a new trial granted.

WOODWARD, J., concurred; CULLEN and BARTLETT, JJ., concurred in result; GOODRICH, P. J., read for affirmance.

GOODRICH, P. J., (dissenting) :

*Stare decisis* is my reason for dissenting from the opinion of Mr.
Justice HATCH.

In *Thompson* v. *B. R. Co.* (145 N. Y. 196) a girl fourteen years
of age, while playing a game of "I spy" in the street, was killed by
a passing car. The court reversed a judgment against the defend-
ant, on the ground that the evidence clearly showed the person
injured to have been guilty of contributory negligence. One state-
ment of the learned judge who wrote the opinion is singularly
applicable to the present controversy. "It is said that she may
have been deceived in reference to the approaching car by reason of
its speed, but she could not have been deceived unless she saw it.
Had she seen it approaching before the other car passed, she would
hardly have been justified in attempting to cross the street after the
first car had passed without again looking for the approaching car."
(Pp. 200–201.)

In *Landrigan* v. *Brooklyn Heights R. R. Co.* (23 App. Div. 43)
we reversed a judgment entered upon a verdict in favor of the
plaintiff, on the sole ground that the evidence showed that the
plaintiff was guilty of contributory negligence. Mr. Justice WIL-
LARD BARTLETT, writing the unanimous opinion of the court, said:
"The plaintiff alighted and went around the rear of the car toward
the further sidewalk of Broadway, in order to reach which it was
necessary for him to pass over the down track of the railroad line.
After he got upon this down track he was struck by the corner of
the dashboard of a mail car coming in the direction opposite to that
pursued by the car which he had just left, and was knocked over
into the gutter. Before he stepped on the rail, he says, he looked
up to see if any car was coming, and saw no car. Broadway is
straight at that point, and there was nothing in the way to prevent
him from seeing the approaching car. Nevertheless, he swears
positively that he did not see it until after he stepped on the
first rail of the down track, when he perceived it about twelve feet
away. At that instant a fireman, on the opposite side of the street,
gave a warning cry, whereupon the plaintiff backed off the track,
but not quickly enough to avoid injury." The opinion declares that
the evidence tended to establish negligence on the part of the
defendant, but the court also held that the plaintiff "failed to sus-

tain the burden which the law placed upon him of proving affirmatively that the injuries which he sustained were not due to his own imprudent conduct or lack of care. Under the circumstances, as he narrates them, it is impossible to avoid the conclusion that if he had looked up the unobstructed street to the extent and with the vigilance demanded by the exercise of ordinary prudence, he would certainly have perceived the car with which he collided a moment later. In such a situation as he occupied it is not only necessary for a traveler to turn his eyes in the direction from which danger may be expected, but he must actively exercise his power of vision and not step blindly into peril."

Mr. Justice HATCH distinguishes that case from the one at bar because, as he says, the Landrigan "accident happened in broad daylight, and it was evident that the plaintiff, in the exercise of ordinary care, ought to have discovered and avoided the approaching car. In the present case the accident happened at night, and the distance from which the car might have been observed was not entirely clear, it being insisted by the plaintiff that the obstruction of the car from which he had alighted, and the surrounding darkness after he had passed it, rendered the proximity of the approaching car quite uncertain."

It is true that the accident in the present case happened at night, but the approaching car could easily have been seen by the plaintiff when it was several hundred feet distant. The motorman of the car from which the plaintiff alighted was called as a witness by the plaintiff, and testified that he saw the approaching car when it was at Twelfth avenue, which, as shown by the diagram in evidence, is about 1,000 feet from the trolley pole station. I think we may assume that the approaching car was lighted, as nothing to the contrary appears, and it was for the plaintiff to prove the absence of the usual lights if he relied upon such fact to account for his failure to see the car. In addition to this, the motorman of the car testified that in his report he stated that "all electrical appliances worked in a first-class and satisfactory manner," and on the trial he testified that this part of his report was true. The plaintiff says that when he rose from his seat he looked and did not see the car or any lights. The testimony of the plaintiff at this point becomes very important: "Q. The car was, you say, still in motion when

you stepped off?    A. It might have been a little in motion, but it was virtually stopped, sir.    Q. From which side of the car did you step off?    A. Stepped off on the left side, sir, so I could get off on the sidewalk.    Q. After you stepped off, Mr. Wise, what did you do?    A. Well, I stood there awhile, and, after I stood awhile, I turned and I says, ' I guess I had better look around,' and I looked ahead and I seen no car, and I went about my business, and I thought to get to the other side, and that is all I recollect, sir.    Q. In order to get to your home, did you have to cross the intervening track?    A. Yes, sir; I had to cross it.    Q. How close to the rear of that car that you got off did you cross?    A. Well, I must have been within about six feet of it; I walked along a piece till I started to cross.    Q. Now, tell us whether or not you had stepped upon the other track when you were struck?    A. Well, that is what I can't say, sir; I don't know, sir; I don't recollect it.    Q. What part of your body was struck?    A. I couldn't tell you, sir."

I cannot understand why the plaintiff did not see the approaching car before he alighted, as the motorman did, for he testified that he looked in its direction.    After he reached the ground his eyes were three or four feet lower than those of the motorman as he stood on the car, but even then the approaching car could have been seen at a great distance.    The diagram in evidence shows that on Bay Ridge avenue, from the scene of the accident to Eleventh avenue, there is an up grade of fourteen inches in each one hundred feet, and that the crest of the hill is at the intersection of that avenue with Bay Ridge avenue, from which the grade of the latter avenue begins to descend at the rate of nine inches in each one hundred feet.    The place of the accident was on the up grade, more than three hundred feet from the crest of the hill.    The eyes of the plaintiff as he stood there between the tracks must have been at least five feet from the ground, that is, taking into account the grade, one foot higher than the crest of the hill, so that he could look over it and down the hill beyond Eleventh avenue.    The headlight of a trolley car, by common observation, is at least three feet above the ground.    Without any very nice mathematical calculation, but with the aid of the diagram above mentioned, it is easy to see that a straight line drawn from this position of the plaintiff's eyes, five feet above the ground, and intersecting the crest

of the hill, would, if continued, meet a point three feet above the surface of the down grade on Bay Ridge avenue (*i. e.*, the headlight of an approaching car), more than one thousand feet beyond the plaintiff as he stood between the tracks. This does not take into consideration any of the lights of the approaching car with the exception of the headlight, but it is apparent that the upper lights could have been seen at a still greater distance. The evidence shows that the car was approaching at a rapid rate, but there must have been a considerable period of time during which the plaintiff, as he stood between the tracks, could have seen this car, if, in the above-quoted language of Mr. Justice WILLARD BARTLETT, "he had looked up the unobstructed street to the extent and with the vigilance demanded by the exercise of ordinary prudence." If the obstruction referred to by Mr. Justice HATCH was the car from which the plaintiff alighted, he should have taken particular care before passing from behind it and over on to the other track. It is stated by Mr. Beach, in his treatise on Contributory Negligence, at section 183, that "Where the view is obstructed, or where for any other reason, it is difficult for the traveler to assure himself that no train is approaching, he is required to be particularly careful." But even this excuse seems to be taken from him by his subsequent testimony. He said that he looked while he was behind the car and then walked into the space between the two tracks. His testimony at this point of the cross-examination was as follows: "Q. And did you look while you were in between the two tracks? A. Of course I did, sir. Q. And did you look up the track again? A. No, I walked a little further and I crossed the street across the track. Q. The question I asked you was did you look after you got between the two tracks? A. I did, sir. Q. And what did you see then? A. I seen nothing. Q. You were then how close to the track on which the car was that struck you? A. About three or four feet. Q. And then you walked onto the track? A. To cross it; yes, sir."

The evidence shows that when the plaintiff was struck the rear ends of the passing cars were only six or eight feet apart and that the plaintiff was struck by the side of the car or the side of the fender before he had actually gotten on the track which he was about to cross. It is incredible that if he had looked he could not have

seen the approaching car, and the familiar rule has especial appli-
cation here.    Either he did not look and so was negligent, or, if he
looked and did not see the car when it was where he could not fail
to see it if he "actively exercised" his power of vision, he was
equally negligent.    From this dilemma, I can see no escape for him.

In *Hickman* v. *Nassau Electric R. R. Co.* (36 App. Div. 376),
the court, speaking through Mr. Justice WOODWARD, said (pp. 378,
379): "It is not enough that the plaintiff should merely look in
both directions; she must look for the purpose of seeing if there is dan-
ger; and if her rate of progress in passing over the danger point is
so slow that a car in traveling at a reasonable rate of speed may be
reasonably expected to have come within view, and in such a posi-
tion as to cause danger, she is not excused from the duty of using
her eyes because she may, at some previous time, have discharged
this duty."

There is another view of this case which has impressed me, and
this arises from the remarks of the learned justice before whom the
case was tried, which appear in the course of the examination of
Dempsey, the first witness called by the plaintiff, and motorman of
the car which struck the plaintiff.    He testified that he did not see
the plaintiff until his car struck him, and that he was struck with the
side of the fender or dashboard; that the car was going so fast that
it went 100 feet after the accident; that the front of his car was
about even with the rear of the other car at the time of the accident.
Dempsey had made two sworn written reports of the accident to
the defendant, one on the night of the accident and another two
days after in which he said that his car was going at less than its
"regular gait;" that he brought it to a stand within five feet from
the place of the accident; that at Twelfth avenue, which, as above
stated, is 700 feet from Eleventh avenue, he saw the other car and,
as he was then on a down grade, shut off the power and half-set the
brake; and that "just as my forward dashboard was even with the
car 4,202 rear dashboard and without seeing him coming, a man fell
against my fender, the inside; that is, he fell against the inside of
the fender nearest the car 4,202."    He also testified at the trial that
these statements contained in his sworn reports, so far as they
related to the speed, brake and the stumble of the plaintiff, were
false and that he made them at the request of defendant's claim

agent in order to save himself from being discharged, but that it was true that the plaintiff fell against the fender and that he staggered from behind the other car and fell against the side bar of the fender.   After the discharge of the witness from the defendant's employ, about six months after the accident, he volunteered to tell the plaintiff and his counsel that his statements were false, and he so testified at the trial.   But he also testified that at the top of the grade, at Eleventh avenue, all the way down to the place of the accident, he was ringing his gong.   It was not singular that the spectacle of a witness of this character impressed the learned trial judge with the unreliability and falsity of his testimony, as shown by the record.

While it is true that the credibility of a witness is matter for the jury and not for the court, occasions may sometimes arise where a witness is so utterly and manifestly unworthy of belief as to influence in some degree the action of the trial court.   Whether this is such a case is not important, for the appellate court may properly consider all the evidence and give to each witness and all the facts their proper weight and decide whether there is any evidence to support a verdict.   If we reject the testimony of Dempsey, as wholly unreliable, the case is stripped of much testimony produced to sustain the plaintiff's theories.   Aside from the plaintiff's testimony already cited, there remains only evidence to show that the approaching car was proceeding rapidly and that the gong was not sounding.   It is true that a jury might have been justified in finding that the plaintiff looked, but in the light of the principle already referred to there was no evidence to overcome the presumption that if he looked he did not see the approaching car, for he testifies that he did not see it, although it must have been in plain sight when he came out from behind his own car.

I do not consider this inconsistent with *Luhrs* v. *Brooklyn Heights R. R. Co.* (13 App. Div. 126), in which this court held that " where one or two competent witnesses testify to facts not incredible, which if believed by the jury would entitle the party to a verdict, the party cannot be deprived of his right to go to the jury because the witnesses who contradict his evidence are more numerous.   The only remedy to the party aggrieved is to move to set aside the verdict."   Here there was evidence which clearly showed that the injury to

the plaintiff was occasioned by his own negligence, irrespective of the question whether the defendant's car was proceeding at unusual speed and without sounding the gong, which alone would not be sufficient to justify a verdict against the defendant.

I think the judgment should be affirmed.

Judgment reversed and new trial granted, costs to abide the event.